Citation Nr: 1121870 
Decision Date: 06/06/11 Archive Date: 06/20/11

DOCKET NO. 06-00 509 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Columbia, South Carolina


THE ISSUES

1. Entitlement to an initial rating in excess of 10 percent for blepharitis with meibomians gland dysfunction and allergic conjunctivitis. 

2. Entitlement to an increased initial rating for tinea corporis, to include keratosis pilaris and tinea pedis, currently evaluated as 10 percent disabling prior to March 22, 2010.

3. Entitlement to an increased rating for tinea corporis, to include keratosis pilaris and tinea pedis, currently evaluated as 60 percent disabling from March 22, 2010.


REPRESENTATION

Appellant represented by: The American Legion



ATTORNEY FOR THE BOARD

S. Mishalanie, Counsel


INTRODUCTION

The Veteran served on active duty from February 2003 to June 2004.

This case comes before the Board of Veterans' Appeals (Board) on appeal from a September 2004 rating decision of the Department of Veterans Affairs (VA) Regional Office (RO) in Columbia, South Carolina, in which the RO, in pertinent part, granted service connection and assigned a 10 percent rating for blepharitis with meibomian gland dysfunction and a 0 percent (noncompensable) rating for tinea corporis, effective June 11, 2004 (the day after the Veteran was discharged from active service).

In September 2009, the Board remanded these matters to the RO, via the Appeals Management Center (AMC) in Washington, DC, for additional development. After the RO completed the requested development, the case was returned to the Board for further appellate review.

The Board notes that, in a March 2006 rating decision, the RO increased the rating assigned for the Veteran's skin disability from 0 to 10 percent, effective June 4, 2011. In a January 2011 rating decision, the AMC increased the disability rating from 10 to 60 percent, effective March 22, 2010 (the date of a VA examination). However, a veteran is generally presumed to be seeking the maximum benefit allowed by law and regulation, and a claim remains in controversy where less than the maximum available benefit is awarded. AB v. Brown, 6 Vet. App. 35 (1993). Therefore, the evaluations of the Veteran's service-connected skin disability remain before the Board on appeal.

In March 2011, the Veteran submitted a statement, additional treatment records, and Internet research in support of his claims for increased ratings. This evidence was accompanied by a waiver of RO consideration. The Board accepts this evidence for inclusion in the record. See 38 C.F.R. § 20.1304 (2010).


FINDINGS OF FACT

1. All notification and development action needed to fairly adjudicate the claims on appeal has been accomplished.

2. From the effective date of the award of service connection, the Veteran's eye disability has been manifested by recurring red, itchy, watery eyes with photosensitivity and occasional mucoid secretions, partially relieved with artificial tears and steroid drops.

3. Prior to March 22, 2010, the Veteran's skin disability was manifested primarily by an itchy rash covering 20 to 40 percent of his entire body; at no time prior to March 22, 2010, did the skin disability affect more than 40 percent of his entire body or exposed areas nor did it require constant or near-constant systemic therapy such as corticosteroids or other immunosuppressive drugs. 

4. From March 22, 2010, the Veteran's skin disability has been manifested primary by an itchy rash covering more than 40 percent of his entire body, but without systemic manifestations. 


CONCLUSIONS OF LAW

1. The criteria for an initial rating in excess of 10 percent for blepharitis with meibomians gland dysfunction and allergic conjunctivitis have not been met. 
38 U.S.C.A. §§ 1155, 5107 (West 2002); 38 C.F.R. §§ 4.1, 4.3, 4.7, 4.79, Diagnostic Code 6018 (2010).

2. Resolving reasonable doubt in the Veteran's favor, the criteria for a 30 percent rating for tinea corporis, to include keratosis pilaris and tinea pedis, prior to March 22, 2010, have been met. 38 U.S.C.A. §§ 1155, 5107 (West 2002); 38 C.F.R. 
§§ 4.1, 4.3, 4.7, 4.118, Diagnostic Code 7806 (2010).

3. The criteria for a rating in excess of 60 percent for tinea corporis, to include keratosis pilaris and tinea pedis, from to March 22, 2010, have not been met. 
38 U.S.C.A. §§ 1155, 5107 (West 2002); 38 C.F.R. §§ 4.1, 4.3, 4.7, 4.118, Diagnostic Code 7806 (2010).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Veterans Claims Assistance Act (VCAA)

The provisions of the Veterans Claims Assistance Act of 2000 (VCAA), codified at 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326(a), and as interpreted by the Court have been fulfilled in correspondence dated in July 2005and January 2010. The correspondence notified the Veteran of VA's responsibilities in obtaining information to assist in completing his claims and identified the Veteran's duties in obtaining information and evidence to substantiate his claims. Subsequently, the claims were reviewed and a supplemental statement of the case (SSOC) was issued in January 2011. See 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326(a)), Quartuccio v. Principi, 16 Vet. App. 183 (2002), Pelegrini v. Principi, 18 Vet. App. 112 (2004). See also Mayfield v. Nicholson, 19 Vet. App. 103, 110 (2005), reversed on other grounds, 444 F.3d 1328 (Fed. Cir. 2006), Dingess/Hartman v. Nicholson, 19 Vet. App. 473 (2006); Mayfield v. Nicholson (Mayfield II), 20 Vet. App. 537 (2006). The Board also notes that 38 C.F.R. § 3.159 was revised, effective May 30, 2008, removing the sentence in subsection (b)(1) stating that VA will request the claimant provide any evidence in the claimant's possession that pertains to the claim. 73 Fed. Reg. 23,353-23,356 (Apr. 30, 2008). 

During the pendency of this appeal, the Court issued a decision in Dingess/Hartman v. Nicholson, 19 Vet. App. 473 (2006) finding that the VCAA notice requirements applied to all elements of a claim. The Veteran was provided such notice in March 2006 letters. 

All pertinent development has been undertaken. VA examinations were conducted in August 2004, August 2005, March 2006, and March 2010. All available, relevant evidence has been obtained in this case, including VA treatment records dated through January 2010 and treatment records from the U.S. Army Heidelberg Health Center and the U.S. Military Hospital in Kuwait. 

The Board finds that the available medical evidence is sufficient for an adequate determination. There has been substantial compliance with all pertinent VA law and regulations and to move forward with the claim would not cause any prejudice to the appellant.

Law and Regulations

Disability ratings are determined by applying the criteria set forth in the VA's Schedule for Rating Disabilities, which is based on the average impairment of earning capacity. Individual disabilities are assigned separate diagnostic codes. 
38 U.S.C.A. § 1155; 38 C.F.R. § 4.1. The basis of disability evaluations is the ability of the body as a whole, or of the psyche, or of a system or organ of the body to function under the ordinary conditions of daily life including employment. 
38 C.F.R. § 4.10.

Where there is a question as to which of two evaluations shall be applied, the higher rating will be assigned if the disability picture more nearly approximates the criteria for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7. After careful consideration of the evidence, any reasonable doubt remaining is resolved in favor of the veteran. 38 U.S.C.A. § 5107; 38 C.F.R. §§ 3.102, 4.3 (2010); Gilbert v. Derwinski, 1 Vet. App. 49, 55 (1990).

At the time of an initial rating, separate ratings can be assigned for separate periods of time based on the facts found - a practice known as "staged" ratings. Fenderson v. West, 12 Vet. App. 119 (1999).

6017
Trachomatous conjunctivitis:
Rating

Active: Evaluate based on visual impairment, minimum
30

Inactive: Evaluate based on residuals, such as visual impairment and disfigurement (diagnostic code 7800).

6018
Chronic conjunctivitis (nontrachomatous):
Rating

Active (with objective findings, such as red, thick conjunctivae, mucous secretion, etc.) 
10

Inactive: Evaluate based on residuals, such as visual impairment and disfigurement (diagnostic code 7800). 

38 C.F.R. § 4.79, Diagnostic Codes 6017-6018 (2010)

7813
Dermatophytosis (ringworm: of body, tinea corporis; of head, tinea capitis; of feet, tinea pedis; of beard area, tinea barbae; of nails, tinea unguium; of inguinal area (jock itch), tinea cruris): 
 
 
Rate as disfigurement of the head, face, or neck (DC 7800), scars (DC's 7801, 7802, 7803, 7804, or 7805), or dermatitis (DC 7806), depending upon the predominant disability. 

38 C.F.R. § 4.118, Diagnostic Code 7813 (2010)

7806
Dermatitis or eczema.
Rating
 
More than 40 percent of the entire body or more than 40 percent of exposed areas affected, or; constant or near-constant systemic therapy such as corticosteroids or other immunosuppressive drugs required during the past 12-month period 
60
 
20 to 40 percent of the entire body or 20 to 40 percent of exposed areas affected, or; systemic therapy such as corticosteroids or other immunosuppressive drugs required for a total duration of six weeks or more, but not constantly, during the past 12-month period 
30
 
At least 5 percent, but less than 20 percent, of the entire body, or at least 5 percent, but less than 20 percent, of exposed areas affected, or; intermittent systemic therapy such as corticosteroids or other immunosuppressive drugs required for a total duration of less than six weeks during the past 12-month period 
10
 
Less than 5 percent of the entire body or less than 5 percent of exposed areas affected, and; no more than topical therapy required during the past 12-month period 
0
 
Or rate as disfigurement of the head, face, or neck (DC 7800) or scars (DC's 7801, 1802, 7803, 7804, or 7805), depending upon the predominant disability. 

38 C.F.R. § 4.118, Diagnostic Code 

Factual Background and Legal Analysis

Eye Disability

A May 2004 VA outpatient treatment record reflects the Veteran's complaints of eye irritation.

The report of an August 2004 VA examination reflects the Veteran's complaints of puffy, red eyes with mucoid secretions. He complained of some photosensitivity and watering of the eyes. He said he used artificial tears as needed. On physical examination, visual acuity at distance was corrected to 20/20 (right eye) and 20/25 (left eye) and at near was corrected to 20/20 in each eye. There was mild blepharitis with trace meibomians gland dysfunction in both eyes. The lids, lashes, conjunctivae, sclera, cornea, anterior chamber, and iris were otherwise normal in both eyes. The diagnoses were mild blepharitis and mild meibomians gland dysfunction in both eyes. 

A February 2005 VA outpatient treatment record indicates the Veteran said that the medicine given for his eyes was not working and he was having problems opening his eyes in the morning. He also complained of burning and watery eyes. 

The report of an August 2005 VA examination reflects the Veteran's complaints of photosensitivity and watery eyes, which he treated with artificial tears two to three days a day with good results. He said that he did not have any decreased vision or distorted vision, but had some blurred vision with blinking or artificial tears. Visual acuity at distance and at near was corrected 20/20 in both eyes. On physical examination, the Veteran's lids, lashes, and adnexa, were normal and no meibomians gland dysfunction or blepharitis was seen. Conjunctiva, sclera, cornea, iris, and lens in each eye were normal. The diagnoses were dry eyes and blepharitis with meibomians gland dysfunction by history. The examiner indicated that there were no findings on examination.

An April 2009 VA optometry note reflects the Veteran's complaints of itchy eyes with yellowish discharge. He said he was using Zaditor eye drops (an antihistamine used to treat allergic pinkeye). Visual acuity was corrected to 20/20 -1 in each eye. On physical examination of the lids and lashes, meibomians gland dysfunction was noted in both eyes with small diffuse papillae. The conjunctiva was white and quiet; pinguecula was noted in both eyes along with inflammation of the conjunctival cysts. The diagnosis was allergic conjunctivitis and dry eyes. The Veteran was given a tapered dose of fluorometholone (a corticosteroid eye drop), and instructed to continue with Zaditor. 

A December 2009 VA optometry note reflects the Veteran's complaints of itchy eyes with morning discharge and mucopurulence. Visual acuity was corrected to 20/25+ in the right eye and 20/25- in the left eye. On physical examination, lids and lashes of both eyes were normal, conjunctiva were clear and quiet, cornea were clear, and irises were normal. The diagnosis was allergic conjunctivitis, relieved with fluorometholone and partially with Zaditor. It was also noted that the Veteran's visual acuity was 20/25 or better and that he had an unspecified disorder of refraction or accommodation. 

The report of a March 2010 VA examination reflects the Veteran's complaints of burning in both eyes, foreign body sensation, yellow discharge in the morning, redness, photophobia, and epiphora (watery eyes). He said his symptoms had been treated with artificial tears, antihistamines, and steroids. He said that steroids seemed to work the best, but that he could not be on steroids all the time and had to by cycled off. He also reported decreased vision and blurry vision. Visual acuity at distance and at near was corrected to 20/25-. On physical examination, the Veteran had trace conjunctival injection (redness) and a few follicles seen on the palpebral conjunctivae bilaterally. He also had melanosis (hyperpigmentation) bilaterally. No Horner-Trantas dots were seen and no chronic inflammation of the anterior chamber was seen. Otherwise the anterior segment was within normal limits. The diagnoses were allergic conjunctivitis, mild to moderate in both eyes; meibomians gland dysfunction by history with minimal to no meibomian gland dysfunction on examination; and myopia bilateral. The examiner opined that it was "at least as likely as not" that the Veteran's allergic conjunctivitis developed when he was in service. 

A February 2011 clinic note from a U.S. Military Hospital in Kuwait reflects that the Veteran reported having itchy, watery red eyes for two weeks. On physical examination of the eyes, there was no discharge, conjunctiva were red, and the lower eyelids were mildly puffy. It was noted that the symptoms appeared to by an allergy and it was noted that he had an optometry appointment later that month. 

A February 17, 2011 ophthalmology clinic note from the Heidelberg Health Center indicates the Veteran complained of decreased vision, itchy eyes, and discharge. It was noted that he had a history of blepharitis, mattering of eyelashes at night, intense itching and relief with topical steroid use. The Veteran had been using maxitrol drops (steroid suspension) for the past two weeks and denied visual complaints. Visual acuity was corrected to 20/40 in each eye. On physical examination, conjunctiva exhibited abnormalities - superiorly and some inferiorly of the conjunctiva in both eyes stained intensely with rose Bengal including the superior cornea and a few areas inferiorly in both eyes with SPK (superficial punctate keratitis) type defects. There were also suggestions of small filaments on the right superior cornea; with lid massage these were removed. The assessment was keratoconjunctivitis: possible SLK (superior limbic keratitis) or very dry eyes, relieved somewhat by topical steroids but reoccurs without topical steroids. It was also noted that the Veteran had superior and some inferior SPK that extended to the conjunctiva in both eyes as well. It was believed that decreased vision might be due to SPK bilaterally. The suggested treatment was heavy lubrication to include celluvisc and lacrilube at night. The Veteran was instructed to taper off maxitrol and follow up the next week. A follow-up note dated on February 22, 2011, reflects that the Veteran was noncompliant with the prescribed regimen. He was instructed to follow-up in 4 to 7 days. 

A February 28, 2011 ophthalmology clinic note from the Heidelberg Health Center reflects that the Veteran had not been using lubrication drops or tapering off steroid drops as instructed. He said that he did not like the lubrication as it blurred his vision and that the steroid drops made his eyes feel better. On physical examination, the external eye showed no abnormalities. Visual acuity was retested with the Veteran's glasses on and an overrefraction of plano; each eye was 20/20 -0. The scleras were normal. SPK was much improved in both eyes, but there was still mild SPK. Conjunctiva was not injected and there were no filaments. The assessment was dry eye syndrome with some improvement on tears, but the Veteran had not been using them as much. The Veteran was reminded of the importance of trying to wean him off steroids and that without using the lubrication drops, his dry eyes would get worse. A March 2, 2011 note indicates that the Veteran had not tapered his use of tobradex as instructed, but had been using the celluvisc and lacrilube. The external eye showed no abnormalities, sclera were normal, cornea were normal with SPK resolved along with injection of conjunctiva. The assessment was dry eye syndrome with improved corneal symptoms. It was noted that the Veteran had low tear film in both eyes but improved with topical lubrication. He was once again instructed to taper off steroids and continue his use of refresh tears and lacrilube at night. With regard to his subjective complaints of visual disturbances, it was noted that a refraction over his glasses with .5 diopter resulted in 20/20 visual acuity in each eye. 

In this case, the Veteran has been diagnosed with blepharitis with meibomians gland dysfunction and allergic conjunctivitis associated with his active military service. The Veteran's service-connected eye condition has been rated as analogous to chronic conjunctivitis (nontrachomatous) under Diagnostic Code 6018. See 38 C.F.R. § 4.20 (2010) (providing that when an unlisted condition is encountered it will be permissible to rate under a closely related disease or injury in which not only the functions affected, but the anatomical localization and symptomatology are closely analogous). A 10 percent rating has been assigned, which is the maximum rating under Diagnostic Code 6018. A 10 percent rating is warranted for active conjunctivitis with objective findings such as red, thick conjunctivae, mucous secretions, etc.

In a February 2011 statement, the Veteran argued that his service-connected eye disability should be evaluated as analogous to trachomatous conjunctivitis under Diagnostic Code 6017 and that he is at least entitled to a 30 percent rating, which is the minimum rating for active trachomatous conjunctivitis. "Trachoma" is chronic contagious microbial inflammation, with hypertrophy, of the conjunctiva, marked by the formation of minute grayish or yellowish transluscent granules caused by Chlamydia tracomatis. Stedman's Medical Dictionary, 1852 (27th ed., 2000). Here, the evidence does not indicate that the Veteran's conjunctivitis is contagious or caused by Chlamydia tracomatis. Rather, the Veteran's conjunctivitis has been described as allergic or caused by dry eyes. Therefore, evaluation under Diagnostic Code 6017 is not appropriate. 

The Veteran also argues that his visual acuity has been impaired. The Board notes that the Veteran has myopia (nearsightedness); however, VA regulations provide that refractive error of the eyes is a developmental defect and not disease or injury within the meaning of applicable legislation. 38 C.F.R. §§ 3.303(c), 4.9. The Board notes that a February 2011 treatment record indicated that the Veteran's decreased vision might be due to SPK; however, this condition quickly resolved with the use of lubrication eye drops. In March 2011, it was noted that the Veteran's vision with a .25 diopter over his glasses was corrected to 20/20. Even assuming that the decreased vision noted in February 2011 was due to his service-connected eye condition, his vision was corrected to 20/40 in each eye, which is consistent with a noncompensable rating under 38 C.F.R. § 4.79, Diagnostic Code 6066 (2010). 

In this case, the Veteran's blepharitis and meibomian gland dysfunction has been mild to nonexistent. While the Veteran has had episodes of allergic conjunctivitis or conjunctivitis caused by dry eye, these conditions have been shown to be relieved by consistent use of lubricating eye drops. There is no indication that these conditions have caused any additional, chronic visual impairment. Under these circumstances, the Board does not find that an initial rating higher than 10 percent for the Veteran's service-connected eye disability is warranted.

Skin Disability

A July 2004 VA outpatient treatment record notes that the Veteran complained of having an itchy rash of both arms for the past 6 months. He said he had returned from Iraq and had multiple sand flea bites while he was there. On physical examination, the Veteran had a scaly maculopapular rash over the extensor aspects of both arms; upper and lower areas of the rash appeared typical of a fungal rash, but he also had some discrete papules which could have represented old flea bites. The assessment was tinea corporis. He was given lotrimin and triamcinolone creams. 

A May 2005 VA outpatient treatment record notes that the Veteran had some dry dermatitis on his arms. He was referred for a dermatology consultation. A June 2005 dermatology consultation note indicates the Veteran had typical keratosis pilaris over the posterior arms, anterior forearms, and posterior thighs along with areas of nummular eczema over the wrists. He also had tinea pedis of the feet. The diagnoses were keratosis pilaris and tinea pedis. He was instructed to avoid soap in the involved areas, use Lidex cream twice daily and moisturize with Vanicream after baths. The Veteran was also instructed to take 250 mg of Lamisil (an antifungal medication) once daily for four weeks.

The report of an August 2005 VA examination reflects the Veteran's complaints of an extremely pruritic rash over his arms, legs, and ankles, particularly over the elbow, knees, and other curvatures. He said he was given antifungal creams in the past, which did not help, and that he was recently given Lidex, which helped but caused discoloration. He said the condition had progressively worsened. On physical examination, there was keratosis pilaris located on the posterior arms, across the anterior forearms, and small areas of nummular eczema along the wrists. There was some follicular keratosis pilaris along the posterior parts of the thighs, calves, and across the knees. A foot examination revealed tinea pedis in the interdigital portions, heels, and forefoot. The examiner indicated that keratosis pilaris affected 0 percent of exposed skin and 22.5 percent of the entire body and that tinea pedis affected 0 percent of exposed skin and 4 percent of the entire body. 

The report of a March 2006 VA examination reflects the Veteran's complaints of itchy rash involving his arms, knees, feet, and back. He described the condition as progressive. On physical examination, there were small hyperpigmented papules scatters across the posterior arms, forearms, right flank, upper buttocks region, posterior thighs, and calves along with areas of hyperkeratosis and lichenification and excoriations from scratching. He also had tinea pedis along the heels, forefoot, and macerations between his toes. The diagnoses were keratosis pilaris and tinea pedis. The examiner indicated that keratosis pilaris involved 0 percent of exposed skin and 12 percent of the entire body and that tinea pedis involved 0 percent of exposed skin and .36 percent of the entire body. 

A July 2009 VA dermatology note indicates the Veteran had atopic dermatitis and tinea pedis with onychomycosis. On physical examination, the physician noted slight scaling between the toes and a moccasin distribution of scale. The nails were no longer involved. His skin overall appeared fairly dry. The Veteran was encouraged to use mild soaps and use Vanicream after baths. For flare-ups, the physician said he could use a steroid dose pack or Kenalog injection; however, he was warned that overuse may lead to various side effects. He was instructed to stop using oral Lamisil; increase his loratadine dose to 10 mg in the morning and at lunch; increase his hydroxyzine to 30 mg or more at bedtime, as necessary for itch relief. Loratadine and hydroxyzine are both antihistamines.

A December 2009 VA dermatology note reflects that the Veteran had areas of scratch marks scattered all over his body including his scrotal area. He had follicular keratosis on the upper arms and the lateral aspects of his upper legs. The assessment was atopic dermatitis, poorly controlled. He was instructed to apply triamcinolone and vanicream. Silvadene cream was suggested for use in the scrotal area. The veteran was also advised to get a humidifier for the areas of his home where he spends most of his time. 

The report of a March 2010 VA examination reflects that the Veteran reported that he had been recently treated with oral steroid medication and anti-fungal medication. He said he had tried various creams with varying degrees of success. He complained of pain at the site of skin lesions, but his primary complaint was itching. On physical examination, his head, face, and neck were all clear. The remainder of the examination revealed mildly scaly lesions bilaterally, which were excoriated. The lower third of his back was affected with 30 percent involvement. His chest showed no involvement, but the lower half of his abdomen had similar lesions with 50 percent involvement. There were hyperpigmented areas on the upper thighs and groin, representing 20 percent of the affected body part. He had similar scaly lesions on the dorsum of both hands, approximately 50 percent involvement. 100 percent of the upper and lower extremities were affected along with scaly areas between his toes and evidence of onychomycosis. The total percentage of exposed skin affected was 16 percent, and 66 percent of the body was apparently affected. The diagnoses were eczema, tinea corporis, cruris, and pedis, and onychomycosis. 

In this case, the Veteran's skin disability has been rated as 10 percent disabling prior to March 22, 2010, and a 60 percent disabling thereafter. Considering the evidence in light of the above-noted rating criteria, the Board finds that a rating higher than 60 percent is not warranted from March 22, 2010; however, resolving reasonable doubt in the Veteran's favor, a higher, 30 percent rating is warranted prior to March 22, 2010. 

The Board points out that despite the Veteran's reports, the evidence does not indicate that he used systemic therapy such as corticosteroids or other immunosuppressive drugs and certainly not constant or near-constant. Rather, the Veteran has been prescribed a combination of topical creams, anti-fungal medication, and antihistamines. In August 2005, keratosis pilaris and tinea pedis affected 22.5 and 4 percent of the Veteran's entire body, respectively. This is consistent with a 30 percent rating under Diagnostic Code 7806, which provides for a 30 percent rating when 20 to 40 percent of the entire body is affected. Although the March 2006 VA examiner indicated that less than 20 percent of the Veteran's body was affected by skin disability, the description of the areas affected were actually more than described during the August 2005 examination. In this regard, the Board notes that the March 2006 VA examiner indicated that the Veteran's right flank and upper buttocks region was affected, which was not noted during the August 2005 VA examination. Hence, it appears that a greater surface area of the Veteran's body was affected in March 2006 even though the examiner's estimated percentage was lower. Resolving reasonable doubt in the Veteran's favor, the Board finds that a 30 percent rating is warranted during this time period. A rating higher than 30 percent is not warranted prior to March 22, 2010, because the evidence did not show more than 40 percent of the entire body or more than 40 percent of exposed areas was affected. 

During the March 22, 2010 VA examination, it was noted that 66 percent of the Veteran's entire body was affected by skin disability. This is consistent with the 60 percent rating assigned and is the maximum rating available under Diagnostic Code 7806. 

In a February 2011 statement, the Veteran argued that he should be entitled to a rating higher than 60 percent because he estimates that more than 70 percent of entire body is affected, which is considerably higher than the 40 percent noted in the rating criteria. He also argues that his skin disability should be evaluated as analogous to exfoliate dermatitis under Diagnostic Code 7817 and that a 100 percent rating should be assigned. He asserts that because of his skin condition, he will have to explain why his skin looks the way it does, he will have to avoid certain soaps, avoid sweating, avoid sudden changes in temperature, and make other lifestyle changes to reduce symptoms. 

The Board has considered the Veteran's arguments, but does not find that a 100 percent rating under Diagnostic Code 7817 is appropriate in this instance. While the Veteran has generalized skin involvement, he has not shown any systemic manifestations such as fever, weight loss, and hypoproteinermia. He has not required constant or near-constant systemic therapy such as therapeutic doses of corticosteroids, immunosuppressive retinoids, PUVA or UVB treatments, or electron beam therapy. While the Veteran has required various topical creams along with oral anti-fungal and antihistamine medications, this type of treatment does not rise to the level of severity contemplated in a 100 percent rating under Diagnostic Code 7817. Moreover, a 60 percent rating is contemplated for any affected percentage over 40 percent - whether 41 percent or 100 percent of the entire body is affected - and the Veteran falls squarely within the middle of this category. 

The Board has also considered whether any other diagnostic code provides a basis for higher rating, but finds none. In the absence of disfigurement of the head, face, or neck, scars, or other skin involvement, evaluation of the Veteran's service-connected skin disability under any other diagnostic code for evaluating the skin is not appropriate. See 38 C.F.R. 4.118. Moreover, the disability is not shown to involve any other factor(s) that would warrant evaluation of the disability under any other provision(s) of the rating schedule.

Both Increased Rating Claims

The Board has also considered whether the Veteran's eye or skin disability presents an exceptional or unusual disability picture as to render impractical the application of the regular schedular standards such that referral to the appropriate officials for consideration of extra-schedular ratings is warranted. See 38 C.F.R. § 3.321(b)(1) (2007); Bagwell v. Brown, 9 Vet. App. 337, 338-39 (1996). In this case, there are no exceptional or unusual factors with regard to the Veteran's eye or skin disability. The threshold factor for extraschedular consideration is a finding that the evidence before VA presents such an exceptional disability picture that the available schedular evaluations for that service-connected disability are inadequate. See Fisher v. Principi, 4 Vet. App. 57, 60 (1993) ("[R]ating schedule will apply unless there are 'exceptional or unusual' factors which render application of the schedule impractical."). Here, the rating criteria reasonably describe his disability level and symptomatology and provides for more severe symptoms than shown by the evidence during the periods in question; thus, his disability picture is contemplated by the rating schedule, and the assigned schedular evaluation is, therefore, adequate. See Thun v. Peake, 22 Vet. App. 111, 115 (2008). Hence, referral for extraschedular consideration is not warranted.

For all the foregoing reasons, the Board concludes that there is no basis for any further staged rating of the Veteran's eye or skin disability pursuant to Fenderson (cited above); that a rating higher than 10 percent for the Veteran's eye disability is not warranted; that a 30 percent, but no higher, rating for his skin disability is warranted prior to March 22, 2010; and that a rating higher than 60 percent for his skin disability is not warranted from March 22, 2010. In reaching this decision, the Board has favorably applied the benefit-of-the-doubt doctrine; however, the Board finds that the preponderance is against assignment of any higher ratings. See 38 U.S.C.A. § 5107(b); 38 C.F.R. §§ 3.102, 4.3; Gilbert v. Derwinski, 1 Vet. App. 49, 55-56 (1990). 


ORDER

An initial rating in excess of 10 percent for blepharitis with meibomians gland dysfunction and allergic conjunctivitis is denied. 

An initial 30 percent rating prior to March 22, 1010 for tinea corporis, to include keratosis pilaris and tinea pedis, is granted, subject to the legal authority governing the payment of VA compensation.

A rating in excess of 60 percent from March 22, 2010 for tinea corporis, to include keratosis pilaris and tinea pedis, is denied. 


____________________________________________
RENÉE M. PELLETIER
 Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs